

Alexis Brode, plaintiff in *propria persona*
229 Pleasant Street, Unit 2
Portsmouth, NH 03801
858-205-4203; akbrode@gmail.com



**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
219 South Dearborn Street, Chicago, IL 60604

ALEXIS BRODE,
PLAINTIFF,

v.                                                    CASE NO. 1:22-CV-02903

XERIS PHARMACEUTICALS, INC.,
DEFENDANT.
_____/

## AMENDED COMPLAINT FOR DISABILITY DISCRIMINATION AND RETALIATION

Alexis Brode ("plaintiff"), sues Xeris Pharmaceuticals, Inc. ("defendant") for violations of the Americans with Disabilities Act of 1990 and the Americans with Disabilities Amendments Act of 2008 (hereafter "ADA" and "ADA-AA", respectively), 42 U.S.C. §12101, *et seq.*, for discrimination, retaliation, and prohibited actions taken on the basis of disability under the "regarded as" and "record of" prongs. Plaintiff petitions for declaratory and injunctive relief under Title I of the ADA as implemented under 29 CFR Part 1630, *et seq.*

### I. JURISDICTION

1. This court has original and exclusive jurisdiction over the plaintiff's claims pursuant to 28 U.S.C. §1331, in that the matters in controversy are brought pursuant to Title I of the ADA and ADA-AA of 2008; 42 U.S.C. §12101 and 42 U.S.C. §12112(a), (b) and (d)(4) as it pertains to "discrimination"; as implemented by 29 CFR Parts 1630.13(b) and 1630.14(b)(3), (c) and (d) as it pertains to adverse employment actions, employers and medical examinations and interventions.

2. Venue is proper in this judicial district under 28 U.S.C. §1391 because the defendant does business in this judicial district and the acts complained of took place in this judicial district.

1

3. All conditions precedent to jurisdiction have occurred or been complied with.

   a) A charge of employment discrimination on the basis of disability was filed with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the commission of the unlawful employment practice alleged herein, namely on or about the date of March 29, 2022.

   b) A Notification of Right to Sue was received from the EEOC on April 7, 2022.

   c) A first complaint was filed on June 2, 2022 within 90 days of receipt of the EEOC's Notification of Right to Sue[1], thereby satisfying the condition.

4. The plaintiff has exhausted all administrative remedies available to her.

## II. PARTIES

5. Plaintiff is a citizen of the United States and resides in Portsmouth, New Hampshire at the address of 229 Pleasant Street, Unit 2.

6. Plaintiff is an individual with a "disability" as that term is defined in Section 3(2) of the ADA, *42 U.S.C. § 12102(2).*

7. Defendant employs 15 or more employees and is an "employer" within the meaning of Section 101(5)(A) of the ADA, *42 U.S.C. § 12111(5)(A)* and has its principal place of business at 1180 LaSalle Street, Chicago, Illinois, 60601 for all times material to the facts giving rise to the complaint.

8. All the discriminatory employment practices alleged herein were committed within the state of Illinois.

## III. PLAIN STATEMENT

9. Plaintiff is claiming defendant discriminated and retaliated against her based upon disability. Plaintiff objected to a new "Covid policy" implemented by her employer. The policy presumed that all employees, including plaintiff, were direct threats and suddenly needed policy-imposed medical treatment for a deadly, contagious disease which the policy was designed to treat. Plaintiff objected, holding that these presumptions failed to rely on objective evidence gathered by conducting an individualized assessment as required prior to regarding and classifying plaintiff as a direct threat. Plaintiff claimed all protected rights; however her employer ignored her claims and began imposing

---

1  A true and correct copy of the EEOC's Right to Sue Letter is alleged and included as Exhibit A.

non-job-related medical inquiries, tests and treatments, and invading plaintiff's medical privacy. Defendant also retaliated and took materially adverse employment actions, including termination, because plaintiff refused prohibited medical tests, treatments and inquiries as outlined in the policy.

## IV. STATEMENTS ON DEFENDANT'S "COVID POLICY"

1. Since 2021, defendant adopted measures known collectively as its "Covid policy", which includes new requirements that employees submit to specific medical treatments, tests and inquiries as new conditions of employment, and specifically a vaccination mandate.

2. Defendant admits that its "Covid policy" is intended to treat and prevent the spread of a deadly, contagious disease.

3. The "Covid policy" assumes that every employee, plaintiff included, requires treatment.

4. The policy assumes that all of its employees are simultaneously at risk and pose a risk to the health of all other employees.

5. The "Covid policy" is based upon the pure speculation and hypothetical belief that every employee of defendant is impaired and requires treatment for this perceived impairment.

6. The "Covid policy" assumes that all employees have an on-going and indefinite condition of impairment as long as they remain "untreated" by the mitigation measures outlined in the policy.

7. The "Covid policy" assumes that one person must take a medical treatment in order for another person's medical treatment to be effective.

8. The "Covid policy" imposes a new qualification standard such that "treated" employees may work and "untreated" employees are subject to termination and other adverse employment actions.

### A. Defendant's "Covid policy" is not authorized.

9. Defendant assumes that it has a new legal duty and new legal authority, as well as the medical competence, to impose medical treatments, tests and inquiries to mitigate a deadly, contagious disease.

10. The adoption of the "Covid policy" did not create any new legal duty nor delegate any new legal authority to the defendant for imposing any mitigation measures in the policy.

**11.** The "Covid policy" did not create any new legal duty for employees to comply with the policy measures.

**12.** Defendant has no proof of any financial responsibility (insurance, etc.) to demonstrate that it has acquired a new legal duty.

**13.** Defendant does not have proof of an insurance policy which compensates anyone for:

    **a)** becoming infected with a deadly, contagious disease after complying with its policy; and

    **b)** suffering any adverse health consequences as a result of complying with its policy.

**14.** Defendant's "Covid policy" does not contain any legal enforcement mechanism.

**15.** There is no new legislative authority which authorizes employers to demand non-job-related medical inquiries and treatments as new conditions of employment.

**16.** Without proper authority, the "Covid policy" cannot be considered legitimate or mandatory.

**17.** Objectively, the policy relies upon the coerced compliance of employees; or alternatively, upon the employers' willingness to force submission to the policy in exchange for disaster funding.

**18.** Objectively, the policy relies upon gaining the voluntary compliance of employees to waiving their rights to informed consent, to medical privacy, to refuse experimental medical treatments under Emergency Use Authorization ("EUA"), and to refuse non-job-related medical inquiries, tests or treatments (rights protected under the ADA).

**19.** A voluntary policy cannot trigger compulsory discipline and termination for non-compliance.

**20.** The "Covid policy" is not a legitimate workplace policy.

**21.** The policy inherently violates the ADA and the ADA-AA.

**22.** The policy inherently violates public health laws.

**B. Defendant's policy triggers violations of the ADA under the "regarded as" prong and the "record of" prong of the ADA.**

**23.** The policy perceives all employees as impaired and in need of treatment with the policy-prescribed mitigation measures.

**24.** The policy regards all "untreated"[2] employees as disabled with a deadly, contagious disease without relying upon any individualized assessment.

**25.** The policy classifies all "untreated" employees as "direct threats" who have an impairment which needs treatment by the policy mitigation measures.

**26.** The policy itself makes a record of impairment by misclassifying all "untreated" employees as "direct threats".

**27.** The policy makes a record of impairment which is not based upon individual assessment.

**28.** Without objective evidence of an impairment, the "untreated" are misclassified as needing "treatment".

**29.** The policy makes a record of impairment via the employer's written communications to all employees and to "untreated" employees.

**30.** The policy imposes mitigation measures upon <u>all workers</u> without considering an individualized medical assessment of an employee's health.

**31.** The policy has no provision to establish through individualized assessment[3] whether a particular employee poses any direct threat to the health of their co-workers.

**32.** The policy regards all "untreated" employees as "direct threats.

### C. Defendant's policy imposes prohibited disability-related and non-job-related medical inquiries and examinations.

**33.** The policy requires medical inquiries, tests and treatments which are intended to identify which employees remain "untreated" and thus are still perceived as "direct threats" because of a perceived disability/impairment.

---

2   All employees who did not use the "mitigation measures" outlined in the policy are considered "untreated". These mitigation measures include wearing masks, taking "Covid tests", taking "Covid vaccines", quarantining, segregating, answering surveys, giving vital statistics, reporting "vaccine" status, waiving medical privacy, waiving informed consent.

3   29 CFR 1630.2 (r) Individualized assessment shall include determining whether an individual would pose a direct threat, the factors to be considered include: the duration of the risk; the nature and severity of the potential harm; the likelihood that the potential harm will occur; and the imminence of the potential harm.

**34.** The policy asks representatives of defendant to make repeated medical inquiries of employees, the purpose of which is to determine whether an employee has been "treated".

**35.** The policy fails to describe how any provision of the policy is directly related to any single employee's essential job functions.[4]

**36.** The policy fails to provide guidance on how to give adequate notice to employees as to the manner in which the policy is directly related to the essential job function of any employee.

**37.** None of the disability-related medical inquiries, tests and treatments are related to the essential job function of the employee.

**38.** None of the non-job-related medical inquiries, tests and treatments are permitted under *29 CFR Part 1630.13(b)*.

**39.** Any employee who refuses the prohibited medical inquiries is regarded as disabled/impaired and in need of treatment.

**40.** The policy fails to include provisions for protecting the medical privacy of employees.

**41.** The policy fails to provide informed consent to employees.

### D. Defendant's policy lacks procedures and guidance necessary for ADA compliance.

**42.** The policy fails to provide guidance for defendant to remain compliant with the ADA when implementing the new "Covid policy".

**43.** The policy fails to provide any provision or guidance for defendant on how to handle employees who refuse "Covid policy" treatments, tests, and inquiries based upon claiming their rights protected under the ADA.

**44.** The policy fails to outline the process for defendant to follow if an employee claims protected status under the ADA.

**45.** The policy does not include an ADA compliant appeals process, employees have no redress.

**46.** The policy fails to instruct defendant on how to properly claim and prove an exemption to its duties under the ADA.

---

4    Defined in 29 CFR 1630.2(n)(2)(i) as "the reason the position exists".

**47.** The policy fails to instruct defendant on the process of showing by financial records, that it would suffer an undue financial burden for an employee's refusal.

**48.** The policy fails to instruct defendant on the process of documenting fundamental alterations to defendant's normal operations caused by an employee's refusal.

**49.** The policy fails to instruct defendant on how to properly perform a direct threat assessment.

### F. Defendant's policy deceptively mischaracterizes non-job-related inquiries, tests and treatments, and religious and medical exemptions as ADA "accommodations".

**50.** The policy fails to offer any accommodations[5] whatsoever that are cognizable under the ADA, specifically in *29 CFR Part 1630.2(o)*.

**51.** Defendant deceptively mischaracterizes "medical exemptions" and "religious exemptions" as accommodations[6].

**52.** These "exemptions" fail to meet the statutory requirements of ADA compliant accommodations because the "exemptions" are not job-related modifications or adjustments that enable a qualified individual with a disability to perform the essential functions of the position.

**53.** The policy also deceptively mischaracterizes non-job-related medical tests, inquiries and treatments as accommodations.[7]

**54.** The policy imposes measures deceptively misclassified as "accommodations" which are actually non-job-related and disability-related medical inquiries, tests and treatments.

**55.** The policy fails to instruct employers that any employee may refuse any accommodation which is not related to their essential job function.

**56.** The policy fails to instruct employers that any employee may refuse any accommodation when the employer does not have a *bona fide* exemption from its legal duties under the ADA, *29 CFR Part 1630.15(d)*.

---

5 Accommodations are defined in 29 CFR Part 1630.2(o) as job-related modifications or adjustments that enable a qualified individual with a disability to perform the essential functions of the position.

6"Medical exemptions" and "religious exemptions" do not qualify as accommodations and the criteria for them is not disclosed, is arbitrary and has no review process. See *29 CFR Part 1630.2(o)(1)(ii)*

7"Covid vaccines", temperature checks, "vaccine attestations", weekly "Covid tests", wearing masks, and quarantine, are not job-related modifications or adjustments that enable a qualified individual with a disability to perform the essential functions of the position.

**57.** The policy fails to include guidance for employers on how to process employee refusals to the policy while maintaining compliance with the ADA.

### G. Defendant's "Covid policy" imposes disparate treatment upon "untreated" employees and upon employees who claim protected status.

**58.** The policy is not uniformly or universally applied to all employees.

**59.** One of the mitigation measures established by defendant's "Covid policy" is a "vaccination mandate".

**60.** On the basis of compliance with this non-job-related medical inquiry and treatment, the policy classifies at least three types of employees: (1) employees who are no longer classified as "direct threats" because they are considered treated and cured ("vaccinated"); (2) employees who are still classified as "direct threats" but who are undergoing treatments, tests and inquiries (such as masking, "Covid testing", "vaccine surveys", "health surveys"); (3) and employees who are still classified as "direct threats", remain "untreated" and claim exclusion from the policy on the basis of the protection of the ADA.

**61.** Defendant's "Covid policy" discriminates against "untreated" employees by using a "treated"/"untreated" qualification standard as a new condition of employment.

**62.** Defendant's "Covid policy" is also disproportionally applied to individuals who claim protected opposition to treatments, tests and inquiries ("Covid policy").

**63.** Protected status is claimed by invoking rights under the ADA and/or by claiming a violation of the ADA.

**64.** Claiming protected status constitutes protected activity under *42 U.S.C. § 12203(a);* and places the claimant in a protected class.

**65.** Defendant's policy fails to respond appropriately to employees claiming protected status.

**66.** The policy fails to provide guidance to employers on how to process employees who claim protected status.

### H. This is a case of first impression and an exceptional condition exists.

67. This is a case of "first impression" because plaintiff has claimed rights to medical privacy, private property rights and informed consent to refuse the "Covid policy's" medical treatments, tests and inquiries.

68. These rights are not limited merely to the "doctor-patient" relationship, but are squarely rooted in the ADA under *29 CFR Parts 1630.9(d), 1630.12(b), 1630.13(b), and 1630.14(c) and (d)* for the reason that these rights are <u>intangible private property rights of people</u>, and of plaintiff specifically, and are protected by law and are not originated or granted by any statute.

69. These rights existed long before any laws were adopted by modern society and in fact, have been exercised in the formation of modern society.

70. Defendant's "Covid policy", which is not authorized by any statute, attempts to overcome established rights that form the bedrock of modern society.

71. This is also a case of "first impression" because plaintiff, in using the ADA to protect her rights, has asked the question: how did defendant suddenly acquire a new legal authority or legal duty to treat plaintiff, its employee, for an impairment without any medical examination or diagnosis? The answer of course is that defendant never did acquire any such legal duty or authority.

72. This is also a case of "first impression" because, while defendant makes the noble-sounding but disingenuous claim that their "Covid policy" is intended to prevent the spread of "Covid", it has absolutely no financial responsibility to engage in or administer such a policy.

73. In fact, employers may adopt a "Covid policy" for the entirely ulterior motive of qualifying for the government's disaster relief funds.

74. This is additionally a case of "first impression" because, if defendant actually had the novel and *bona fide* legal right to require plaintiff to disclose her medical records, then defendant would have the right to simply obtain the name and address of plaintiff's physician and request such records directly from the physician.

75. It is well-established that no physician would make such disclosure without the express written permission of the patient (plaintiff) or without a *bona fide* court order.

**76.** An "exceptional condition" exists with this case which must be acknowledged. When the United States District Court itself has adopted the same policies as defendant, it begs the question: can the Court be impartial?

## V. STATEMENTS OF FACT

**10.** Plaintiff was a top performing sales representative for Strongbridge Biopharma from November 20, 2017 until the merger with Xeris Pharmaceuticals commencing on October 6, 2021.

**11.** On that date, Mary Beth McNerney, Vice President of Sales informed all Strongbridge employees through a Zoom call that there would be a requirement to get treated with the Covid-19 Vaccine.

**12.** On October 7, 2021, Jazmin Gomez (HR) presented additional information on the company's new COVID-19 vaccine treatment requirements on an HR Orientation Zoom call.

**13.** On October 11, 2021, plaintiff received an email from Jazmin Gomez (HR) regarding defendant's policies for all personnel to be "fully vaccinated" as a new condition of employment.

**14.** On October 14, 2021, plaintiff received another email from Ms. Gomez (HR) informing her that she had to submit her private medical information regarding her treatment by submitting a Covid-19 vaccination card to Human Resources by November 24th, 2021, but asking her to submit it as soon as possible.

**15.** On October 20, 2021, plaintiff received a phone call from Kevin McCulloch, Chief Commercial Officer, reinforcing the vaccination card due date of November 24th, 2021. Plaintiff informed him that she needed to do some research on the risks and benefits of the new treatment as none had been provided by the company, and she understood that getting medical treatments like a COVID vaccine was a personal decision, to which Mr. McCulloch responded that, while he respected her process, the company might not be the right place for her. Plaintiff understood from this exchange that the company stance was that all employees needed this medical treatment regardless of medical history or diagnosis.

**16.** On November 2, 2021, plaintiff called Ms. Gomez (HR) and left her a message regarding questions she had on exemptions and who to speak to. Ms. Gomez called plaintiff back and told her to email Kendel Korte (VP Human Resources) and Aubrey Papaelioiu (Associate Director, HR), which plaintiff did on the same day.

**17.** That same day Kendal Korte responded back informing plaintiff to write a written request for her religious exemption. Plaintiff was never informed of any option to "exempt" herself from defendant's "Covid-19 policy" based upon claiming her rights under the ADA.

**18.** On November 8, 2021, plaintiff emailed her request for religious and personal/constitutional exemption.

**19.** On November 12, 2021, the VP of Human Resources informed plaintiff via telephone call that her request for a "religious exemption" was approved, and it entailed putting her on unpaid personal leave beginning November 29, 2021 and lasting until she received the medical treatment or until the company ended this vaccination requirement.

**20.** On November 16, 2021, plaintiff responded in writing through a letter that stated that she was willing, able and ready to work, that she was not voluntarily leaving the company, and asking the company to recognize her right to refuse this medical treatment that was not necessary for her to perform the duties of her job.

**21.** On November 23, 2021, plaintiff received a final correspondence from Beth P. Hecht, Chief Legal Officer and Corporate Secretary, declining her request to refuse medical treatment without penalty.

**22.** Since November 29, 2021, plaintiff was placed on unpaid leave for no other reason than because she refused this medical treatment.

**23.** On March 23, 2022, plaintiff sent Kendal Korte (VP Human Resources) an email claiming the protection of the ADA with a "Notice of Discrimination and Harassment Based upon Disability" attached. She asked it to be included in her personnel file.

**24.** In this notice, the plaintiff contended that because her employer required her to get a series of injections to treat a specific disease that this demonstrated that the employer assumed plaintiff was impaired and in need of specific medical treatment before it would allow her to return to work. Plaintiff claimed that such actions show that the employer perceives the plaintiff as if she is impaired or disabled unless she receives treatment.

**25.** Plaintiff expressed that the medical treatments are not related in any way to her ability to perform her job duties and on this basis may ADA prohibitions against certain medical treatments, tests and inquiries.

11

**26.** Plaintiff claimed her right to informed consent or medical privacy in this notice and also asked the employer to provide her with the objective evidence it was relying upon to consider her a safety threat to the health of others as long as she remain untreated.

**27.** Plaintiff asked the employer how she could be considered a threat to any person who had already taken the treatment, or alternatively, if other people's treatments don't protect them, then why should she take it?

**28.** Plaintiff asked her employer to explain how the company acquired the legal right and legal authority to impose specific medical treatments for a disease plaintiff had never been diagnosed with.

**29.** On March 29, 2022, plaintiff filed a charge of Discrimination with the EEOC.

**30.** On April 4, 2022, plaintiff received confirmation of her EEOC charge and requested a Right to Sue letter in writing to Virginia Holmes (Senior Investigator).

**31.** On the same date, plaintiff arranged a conversation with Kendal Korte (VP Human Resources) and Beth Hecht, Chief Legal Officer to discuss her March 23rd notice and the questions it presented. Korte and Hecht refused to answer plaintiff's credible concerns about potential violations or offer meaningful redress, instead they informed plaintiff that they would send her a separation agreement.

**32.** On April 6, 2022, plaintiff received a separation agreement along with a request for her to withdraw her EEOC charge. The separation agreement also stated that plaintiff's termination date was April 6, 2022.

**33.** On April 7, 2022, plaintiff received a Right to Sue letter from the EEOC.

**34.** On April 8, 2022, plaintiff sent an email to Kendal Korte (VP Human Resources) and Beth Hecht, Chief Legal Officer, with her counteroffer to settle outside the court on the condition of the employer recognizing her right to refuse the medical treatments without losing her job in the process.

**35.** On April 14, 2022, plaintiff received a letter of settlement/separation offer from Beth Hecht Chief legal Counsel at Xeris. The letter implied that plaintiff's termination date was extended to April 22, 2022.

**36.** On April 15, 2022, plaintiff's ADA advocate sent Beth Hecht, Chief Legal Officer, a letter for records supporting ADA compliance and showing how the medical treatment was related to the performance of plaintiff's job duties and a copy of the direct threat assessment the company relied upon to determine that the plaintiff presented a specific health risk to others.

**37.** On April 19, 2022, plaintiff received a response from Ms. Hecht proposing the same settlement offer and which now included a disclaimer stating that the defendant denied that imposing new medical treatments as a condition of employment violated any rights protected under the ADA.

**38.** On April 22, 2022, plaintiff responded to the settlement offer Ms. Hecht proposed by stating that the document tended to limit plaintiff's rights protected under the ADA which the plaintiff did not intend to waive. To this date, plaintiff has received no further response.

**39.** A true and correct copy of all written communications are attached in Exhibit A.

## VI. LEGAL STANDARDS

**40. Discrimination on the basis of disability.** Title I of the ADA provides that "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to...hiring, advancement, discharge...and other terms, conditions and privileges of employment." *42 U.S.C. §12112(a).*

**41.** To make out a *prima facie* case of discrimination under the ADA, a plaintiff must establish that: (1) her employer is subject to the ADA; (2) she was disabled within the meaning of the ADA; (3) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) she suffered adverse employment action because of her disability.

**42. Retaliation on the basis of disability.** Title I of the ADA not only prohibits employment discrimination on the basis of an individual's disability, but it also prohibits retaliation against any individual who has "opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in any investigation, proceeding or hearing under the ADA." *42 U.S.C. §12203(a).*

**43.** To state a claim for ADA retaliation, a plaintiff must allege that: (1) she engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took an adverse employment action against her; and (4) a causal connection exists between the alleged

adverse action and the protected activity. A plaintiff must allege that her protected activity was the but-for cause of the adverse employment action.

## VII. CLAIMS

### Count I. Defendant discriminated plaintiff on the basis of disability.

44. The ADA directs courts to construe the definition of "disability" broadly "in favor of expansive coverage to the maximum extent permitted by the terms" of the statute.

45. The ADA-AA also establishes that "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability." *29 CFR 1630.1(c)(4)*.

46. Accordingly, courts have noted that the bar to be considered "disabled" under the ADA is not a high one.

47. Plaintiff alleges that: (1) her employer employer is a covered entity subject to the ADA; (2) she is "disabled" within the meaning of the ADA; (3) she is qualified to perform her essential job functions; and (4) she is suffering adverse employment actions because of her disability.

### A. Plaintiff's employer is subject to the ADA.

48. Defendant is a covered entity as defined under *29 CFR 1630.2(e)(1)*.

### B. Plaintiff is disabled within the meaning of the ADA.

49. Disability cases typically involve plaintiffs who have assumed the burden of proof under the "actual" or "diagnosed" prong of the ADA; whereas, plaintiff is proceeding under both the "regarded as" and the "record of" prongs of the ADA where the burden of proof is upon defendant to prove that it qualified for an exemption or exception to their legal duties to comply with the ADA. These are further expressed in this complaint.

### 1. Defendant regarded plaintiff as disabled.

50. An individual is "regarded as" having a disability if she: (1) has a physical or mental impairment that does not substantially limit major life activities but is treated by the covered entity as constituting such limitation; (2) has a physical or mental impairment that substantially limits major

14

life activities only as a result of the attitudes or actions of others toward such impairment; or (3) *has no such impairment but is treated by a covered entity as having a substantially limiting impairment*.

51. Under the ADA, the standard for a "regarded as" disability claim simply requires the individual to establish that she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity. *42 U.S.C.S. § 12102(3)(A)*.

52. For a "regarded as" claim a plaintiff does not need to plead whether the impairment substantially limited a major life activity. Whether a plaintiff is regarded as disabled turns on the *employer's perception of the employee as demonstrated by the actions it took*.

53. What matters for the "regarded as" theory is whether the employer perceived plaintiff as impaired, not whether she was actually impaired. This more liberal standard makes it significantly easier for a plaintiff to show disability.

54. In this case, plaintiff is claiming that her employer, through the "Covid policy", treats her as if she has a substantially limiting impairment, because it requires treatment for the impairment.

55. Through its "Covid policy", defendant regards and treats plaintiff as if she has an on-going and indefinite condition of impairment that warrants the mitigation measures outlined in its policy.

56. Defendant imposed several medical treatments, tests and inquiries upon plaintiff that, in light of defendant's "Covid policy", demonstrate that defendant perceives plaintiff as a direct threat to others unless plaintiff is treated by mitigation measures which include "vaccination".

57. Defendant imposed adverse employment actions on plaintiff for no other reason than because she refused treatments or complied under duress while expressing opposition.

58. Defendant imposed materially adverse changes in the terms and conditions of plaintiff's employment because the "Covid policy" perceived plaintiff as a direct threat.

59. Defendant's perception that plaintiff has a disability was formed without an individualized assessment or any *bona fide* medical diagnosis.

60. For defendant, it is not relevant if plaintiff actually has the contagious disease, as it imposes medical treatments, tests and inquiries regardless.

**61.** Defendant refuses to allow plaintiff to continue working in-person without first submitting to its discriminatory "Covid policy". Therefore, it is actually defendant's "Covid policy" that impairs plaintiff's ability to perform her essential job functions by imposing mitigation measures that create a physical impairment that substantially limits plaintiff's ability to engage in major life activities, such as working.

**2. Defendant made a record of disability by misclassifying plaintiff as impaired because plaintiff refused or opposed "treatment".**

**62.** To state a prima facie disability claim based on a "record of" a disability, a plaintiff must plausibly allege a "history of an impairment that substantially limited one or more major life activities when compared to most people in the general population, *or was misclassified as having had such an impairment*." *29 C.F.R. § 1630.2(k)(2) (emphasis added)*

**63.** The "Covid policy" itself misclassifies plaintiff as having an impairment that it perceives as substantially limiting plaintiff's ability to perform plaintiff's job functions "safely".

**64.** Defendant made a record of disability by classifying plaintiff as an "untreated" employee, because she refused "Covid vaccines", while she opposed having her medical privacy rights violated by "vaccine attestation".

**65.** Based upon this record, defendant has taken several adverse employment actions towards plaintiff. Defendant repeatedly interfered with plaintiff's rights and tried to harass and coerce plaintiff into compliance with prohibited medical treatments, tests and inquiries.

**66.** Defendant also punished plaintiff with materially adverse changes in the terms and conditions of employment specifically because plaintiff refused prohibited medical treatments, tests and inquiries; and because plaintiff claimed exclusion to the "Covid policy" because of rights protected by the ADA.

**67.** This is a case of a perceived disability, thus it follows that the record of impairment made in this case is a misclassification of a perceived impairment.

**68.** Defendant further insists that employees misclassified as impaired because they are "untreated" submit to on-going "PCR testing", which clearly demonstrates that the employer classifies and

regards "untreated" employees as still contagious/impaired, while "vaccinated" employees are no longer classified and perceived as contagious/impaired.[8]

69. It is evident that the employer is misclassifying plaintiff by gathering "vaccine status" records. However, the "unvaccinated status" is not the disability; rather once the defendant records the "vaccine status" it alters terms and conditions of employment for the "unvaccinated" implement adverse employment actions which demonstrates that the "Covid policy" misclassifies all "untreated" employees as impaired under the "record of" prong.

70. Defendant, by its own policies, attitude toward plaintiff, written communications, method of record-keeping and general treatment of plaintiff, created a set of facts that satisfy the criteria under the ADA's "regarded as" and "record of" disability prongs.

**3. Defendant violated plaintiff's rights protected by the ADA by imposing its "Covid policy" upon her.**

**(a) Defendant requires non-job related medical examinations and treatments of plaintiff that are not consistent with any conceivable business necessity.**

71. It is unlawful for a covered entity to require a medical examination of an employee or to make inquiries as to whether an employee is an individual with a disability or as to the nature or severity of such disability, except when it is job-related and consistent with business necessity or they relate to the ability of an employee to perform job-related functions. *29 CFR § 1630.13(b) and § 1630.14.*

72. Defendant requires non-job-related medical examinations and disability-related inquiries of plaintiff that are not consistent with any conceivable business necessity and not permitted under *29 CFR Part 1630.13(b)*.

73. Defendant's "Covid policy" imposes certain non-job-related and disability-related medical inquiries on plaintiff including, vaccine status records.

74. Defendant also assumes that its policy is the proper treatment to mitigate the effects of "Covid-19" in the workplace.

75. However, defendant has not consulted any *bona fide* or competent medical professional regarding the involuntary application of its "Covid policy" upon its employees.

---

8    Despite the fact that the "Covid-19 vaccine" does not claim to prevent infection or provide immunity. It is non-sensical to insist that plaintiff take a "Covid-19 vaccine" for the benefit of someone else's health. It is only advertised to "lessen symptoms" which only provides a benefit to the user.

**76.** Defendant's "Covid policy" imposes certain non-job-related medical treatments including, but not limited to: taking experimental "vaccines".

**77.** These medical treatments and medical inquiries are beyond the scope of the employee-employer relationship (contract) when they are non-job-related and disability-related; in addition defendant is trespassing on plaintiff's medical privacy rights and informed consent, both of these issues are expressed in the ADA.

**78.** Defendant has not provided proof that a "Covid-19 vaccine" prevents infection and transmission of a disease as defined by modern scientific standards.

**79.** Defendant has not provided proof that taking the "Covid-19 vaccine" would prevent anyone other than the user from experiencing symptoms.

**80.** A vaccine protects the person taking it, and there is absolutely no scientific standard where any vaccine is taken to protect anyone else but the person taking it.

**81.** The "Covid-19 vaccines" demanded by defendant are experimental because the policy was adopted during the Emergency Use Authorization (EUA) period and none of these experimental "vaccines" have been <u>approved</u> by the Food and Drug Administration, they have only been "authorized" for emergency use which means they are in clinical trial phase.

**82.** The only "Covid-19 vaccine" that is FDA-<u>approved</u>, Comirnaty, is not commercially available in the United States, should plaintiff choose to take it.[9]

**83.** The "Covid policy" as implemented by defendant allows un-skilled and unlicensed individuals to impose medical inquiries, tests and interventions upon employees because commentary on a website states that such inquiries, tests and interventions might prevent a disease, even when these very websites disclaim such commentary as valid legal or medical advice (e.g., CDC[10], EEOC[11], etc.).

**84.** Defendant has never provided notice of any kind to plaintiff, advising plaintiff as to the manner in which these medical treatments and medical inquiries are related to her essential job function.

---

9    There is controversy as to whether the Moderna "Spikevax" formulation has actually received approval and it also is not commercially available. Regardless, the EUA period is still in effect, as of the date of this filing it has not been rescinded by the FDA.

10   https://www.cdc.gov/other/disclaimer.html

11   https://www.eeoc.gov/disclaimer

85. In fact, none of the mitigation measures are related to plaintiff's essential job function because plaintiff is able to continue performing her essential employment duties without participating in defendant's "Covid policy".

86. Plaintiff also alleged in her testimony and in written communications[12] that she is both willing and able to continue performing her employment duties and that defendant's "Covid policy" is not related in any way to her essential job functions.

87. These inquiries, tests and treatments are disability-related because they are designed to reveal or treat the disability perceived by the "Covid policy".

**(b) Defendant interferes with plaintiff's right to medical privacy.**

88. Information regarding the medical condition or history of an employee shall be treated as a confidential medical record and shall not be used for any purpose inconsistent with the ADA. *29 CFR §1630.14(c).*

89. Defendant's "Covid policy" violates *29 CFR §1630.14(c)* of the ADA because it involves sharing non-job-related medical classifications (e.g. "vaccination status") without any regard to confidentiality.

90. The "Covid policy" includes no provision to preserve the medical privacy rights of any employee, including plaintiff's.

**(c) Defendant failed to conduct any individualized assessment to determine that plaintiff is a direct threat.**

91. The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. *29 CFR § 1630.2(r)*

92. Defendant has failed to conduct any individualized assessment establishing that plaintiff is a direct threat.

93. Defendant simply punishes plaintiff for her good faith refusal to participate in its "Covid policy" on the pure speculation that plaintiff has a disability.

---

12  A true and correct copy of which is alleged as Exhibit A.

**94.** Defendant acts on the false premise that it has the legal duty and authority to protect plaintiff and everyone else from contracting such a deadly, contagious disease (disability).

**95.** Defendant claiming that plaintiff has a deadly contagious disease, or that she might someday become infected with such a disease, is not a defense to violating the ADA, specifically, *29 CFR Parts 1630.9(d), 1630.12(b), 1630.13(b) and 1630.14(b), (c) and (d)*.

**96.** Defendant cannot rely upon news or public announcements to determine that plaintiff individually poses a direct threat because the statute requires a *bona fide* medical examination and diagnosis by a physician.

**97.** Defendant acts irrationally by regarding plaintiff and others as having an illness without any diagnosis, and then seeks to treat everyone with the same medical intervention without any diagnosis.

**98.** This behavior is defined as a mental illness in the Fifth Edition of the <u>Diagnostic and Statistical Manual for Mental Health</u>.[13] The "Covid policy" generates such irrational behavior from those seeking to impose that they act "as if" they are suffering from an un-diagnosed mental illness.

**99.** Additionally, defendant cannot allege that the medical treatments established in its "Covid policy" are necessary to guarantee the "safety" of its employees, when the treatments are non-job-related, the treatments imposed are only claimed to benefit the user, there has been no actual diagnosis of disease prior to imposing the treatments, and defendant offers certain employees the possibility of being "exempted" from certain treatments for medical or religious reasons.

**(d) Plaintiff is not required to request religious nor medical exemptions from defendant's Covid policy.**

**100.** Plaintiff is not required to request exemptions from defendant's "Covid policy" for religious or medical reasons because none of its provisions are related to plaintiff's essential job function.

**101.** Plaintiff is not required to request any accommodations or reasonable modifications because none of the "Covid policy's" provisions are related to her essential job function.

**102.** While plaintiff has no duty to request any reasonable modification or accommodation to defendant's "Covid policy", she was deceptively informed that she must request a "religious or medical exemption".

---

13 Factitious Disorder or Munchausen Syndrome by Proxy.

103.    The "accommodations" of religious or medical exemptions fail to meet the statutory requirements of ADA compliant accommodations as defined in *29 CFR Part 1630.2(o)* because the "exemptions" offered are not job-related adjustments to the workplace environment.

104.    Defendant's policy does not impose any new legal duties upon plaintiff from which she could be exempted or needs to request exemption from.

105.    Defendant's deceptive "exemption" practice is only intended to give the appearance of fairness because it can arbitrarily deny or revoke exemptions.

106.    Defendant has not disclosed the qualifying criteria for such an "exemption" nor disclosed the legal duty from which plaintiff is being "exempted".

107.    Plaintiff is not required to discuss the nature of an un-assessed disability she is "assumed" to have; nor is she required to request any "reasonable modifications", for an un-assessed disability she is assumed to have.

108.    Plaintiff is protected under the ADA and she claimed her rights.

109.    Plaintiff is not required to use the language of the ADA to claim this protection, however plaintiff did specifically give notice to defendant that she was a qualified individual who was being regarded as having a disability by defendant's policy.

110.    The ADA protects all employees, not just those with disabilities, from non-job-related medical treatments, tests and inquiries and invasions of medical privacy.

**C. Plaintiff is qualified to perform the essential functions of her job.**

111.    Plaintiff is qualified for her job as a sales representative and has all the necessary credentials to carry out the required duties of her position.

112.    Plaintiff is obviously qualified for a job she was already doing, and she was willing to continue performing her job functions.

113.    Despite plaintiff's qualifications, plaintiff is denied equal access to defendant's premises and was terminated.

**D. Plaintiff has suffered adverse employment actions because of perceived disability.**

114.  An ADA plaintiff suffers an adverse employment action when she endures a materially adverse change in the terms and conditions of employment or when her rights are interfered with.

115.  Plaintiff alleges that the terms and conditions of employment have been altered and diminished.

116.  The "Covid policy" altered the terms regarding working conditions: her employer established a vaccine mandate.

117.  The "Covid policy" altered the terms regarding discipline: the consequence for not abiding to the policy was unpaid leave, and termination.

118.  The "Covid policy" altered the terms regarding plaintiff's medical privacy: plaintiff was asked to disclose her vaccination status.

119.  The "Covid policy" altered the terms of the contract to include prohibited medical treatments and inquiries. The ADA prohibits non-job related for all employees, not just for employees who claim disability.

120.  The "Covid policy" refused to recognize plaintiff's right to refuse non-job-related medical test, treatments and inquiries.

121.  The "Covid policy" also refused to recognize plaintiff's right to refuse disability-related inquiries.

122.  Plaintiff's employer has imposed prohibited measures and refused to recognize her claim of protected status, especially after she opposed the policy and pointed out that the imposed mitigation measures were not compulsory by law.

123.  Ultimately, plaintiff was terminated for refusing treatments, tests and inquiries.

124.  The adverse actions alleged above demonstrate that defendant discriminated against plaintiff on the basis of disability and retaliated against her specifically because she refused measures while opposing mitigation measures established by defendant's "Covid policy".

125.  The adverse actions alleged above demonstrate that "Covid policy" presumes that plaintiff is disabled because she remains "untreated", and because, and she consistently opposed the treatments, tests and inquiries.

**126.** Plaintiff's allegations satisfy the elements of discrimination and show that she falls within a protected group, that she is qualified for the position she held, that she is subjected to non-job-related medical inquiries, tests and treatments, and she is subject to adverse employment actions and that these adverse employment actions are taken under circumstances which constitute unlawful discrimination.

**Count II. Defendant retaliates against plaintiff on the basis of disability.**

**127.** Plaintiff engaged in activity protected by the ADA by opposing her employer's discriminatory "Covid policy", pointing out the defendant's ADA violations, and by arguing that defendant was not exempt from complying with the ADA.

**128.** Defendant is aware of this protected activity, but decided to ignore it.

**129.** Defendant has taken adverse employment actions against plaintiff.

**130.** Plaintiff's opposition and non-compliance of defendant's "Covid policy" is the only reason for the adverse employment actions.

**A. Plaintiff engaged in activity protected by the ADA.**

**131.** Plaintiff protested and opposed her employer's discriminatory "Covid policy" and defendant is aware that plaintiff engaged in such protected activity.

**1. Plaintiff protested and opposed defendant's discriminatory "Covid policy".**

**132.** Defendant's "Covid policy" regards employees as disabled, and uses standards, tests, and criteria that screen out employees with perceived disabilities which thereby, constitutes disability discrimination, in addition to what is described in the following allegations.

**133.** Plaintiff, in good faith, believes that defendant's "Covid policy" is unlawful because:

**a)** it is not mandated by statute;

**b)** it infringes upon her rights to property, bodily integrity, medical privacy, informed consent, and those protected under the ADA; and

**c)** it has been disproportionally applied to her since she refused the measures and opposed the policy based on her rights.

134.  As argued above, defendant's "Covid policy" is a failed policy because it does not include several necessary provisions to:

   a) remain compliant with disability law or address the needs of employees with disabilities.

   b) protect the medical privacy of employees, and specifically plaintiff's.

135.  Additionally, the "Covid policy" lacks any authorized enforcement provisions and relies either on plaintiff to voluntarily waive her rights to medical privacy, informed consent, and rights protected under the ADA **or** upon defendant's willingness to force submission to policy in exchange for disaster funding.

136.  Defendant's "Covid policy" is applied in a discriminatory fashion by identifying distinct groups of employees, such as those who are "treated" and those who are "untreated" and giving them disparate terms and conditions of employment.

137.  It is not necessary to allege that defendant's agents personally regard plaintiff as having a disability. Defendant's "Covid policy" itself clearly demonstrates that defendant seeks to impose the policy's provisions upon plaintiff based upon the pure speculation, stereotype and generalization that she is impaired and in need of treatment.

138.  Furthermore, defendant's "Covid policy" has not been uniformly or universally applied to plaintiff since defendant began making a record of such disability by mis-classifying plaintiff as having an impairment which needs to be treated or cured by defendant's "Covid policy".

139.  Upon giving defendant notice that she was regarded as having a disability,[14] plaintiff identified herself as being within a protected group.

140.  Plaintiff claimed her rights to refuse defendant's mitigation measures through the process of good faith opposition and she engaged in a protected activity.

141.  Defendant imposes the policy on everyone equally but fails to recognize that plaintiff:

   a) claimed protected status and thus is in a separate class to everyone else who has not invoked their rights under the ADA;

   b) gave notice of being regarded as having a disability; and

---

14 As an employee she is, of course, understood to be a "qualified individual".

c) objected to submitting to non-job-related and disability-related medical tests, inquires and treatments.

142. Defendant imposes its "Covid policy" on everyone equally but treats all those that attempted to exclude themselves from the mitigation measures in disparate ways.

143. As an analogy: consider a defendant requiring a wheelchair-bound employee to use the stairs or face loss of income, title or employment termination because e*veryone is required to use the stairs and the policy is applied equally to everyone.* It is clear that this is an erroneous conclusion that does not allow disability rights.

144. Plaintiff alleges that the following conduct constituted protected activity: opposing non-job-related medical treatments, tests and inquiries; claiming getting vaccinated was a personal decision that required informed consent; posing questions regarding the policy and asking for a representative to speak with; asking for an exemption (even when she was not legally required to); writing a defense letter against the decision of placing her on unpaid leave as an "accommodation"; sending a "Notice of Discrimination, Harassment, and Retaliation Based On Disability" to defendant's representatives; filing a Charge of Discrimination to the EEOC; getting an ADA advocate; claiming her rights under the ADA, inter alia.

145. Plaintiff exercised her right to refuse defendant's "Covid policy" mitigation measures based upon a good faith belief that the policy does not apply to her because:

a) the policy violates the ADA;

b) defendant has failed to establish any exemption or exception to its legal duty to comply with the ADA;

c) the policy is not related in any way to her essential job function; and

d) defendant has failed to give plaintiff conspicuous notice as the manner in which its policy is related in any way to her essential job function.

146. Exercising this right is a protected activity and defendant's "Covid policy" is not equally or universally applied to plaintiff because she has given notice of a disability and is therefore in a protected class and engaged in a protected activity.

**2. Defendant was not exempt from complying with the ADA.**

147.    Since plaintiff is in a protected class and has engaged in protected activity, she is not required to participate in defendant's policy under *29 CFR Part 1630.9(d)*, unless defendant establishes an exemption or exception to its legal duty to comply with the ADA.

148.    Defendant has failed to identify or describe any set of facts establishing that:

    **a)** plaintiff's good faith refusal to participate in defendant's "Covid policy" has created any undue financial hardship;

    **b)** plaintiff's good faith refusal to participate in defendant's "Covid policy" has fundamentally altered normal business operations; or

    **c)** it would lose medicare funding because the plaintiff remains "untreated".

149.    Defendant will lose funding for being found non-compliant with its duties under the ADA.

150.    Defendant requires non-job-related medical examinations of plaintiff that are not consistent with any conceivable business necessity.

151.    Defendant makes disability-related inquiries of plaintiff that are not consistent with business necessity and not permitted under *29 CFR Part 1630.13(b)*.

152.    Defendant cannot claim the perceived disability is both "transitory and minor" because it retaliates against the plaintiff based upon perceiving the plaintiff as a "direct threat" with an on-going condition of contagiousness.

153.    If the perceived disability is **both** transitory **and** minor, such as having the common cold, defendant should establish the necessity of implementing such a draconian policy.

154.    There is no established end-date when defendant would cease regarding plaintiff in need of mitigation.

155.    Defendant cannot now claim that such disability is "transitory", especially since it is not acting upon any medical diagnosis, court order obtained by the Department of Health, or any individualized assessment establishing that plaintiff individually is a direct threat.

156.    To this day, defendant has failed to demonstrate that it met or satisfied any exemptions or exceptions to its *bona fide* legal duties under the ADA to aid and encourage those with disabilities, including plaintiff.

157. Defendant cannot claim that its perceived plaintiff as a "direct threat" of an undiagnosed contagious disease and simultaneously claim that its perception is both "transitory and minor".

158. This perception has been ongoing since defendant implemented its "Covid policy". What matters in a "regarded as" claim is defendant's perception.

159. Plaintiff's allegations easily satisfy the elements of discrimination by showing that she falls within a protected group, that she is qualified for the position she held, that she was subject to adverse employment actions and that the adverse employment actions were taken under circumstances which constitute unlawful retaliation.

**B. Defendant is aware of plaintiff's participation in the protected activity.**

160. Plaintiff has claimed her rights and expressed her opposition on more than one occasion. She filed a discrimination notice and had sustained email and in-person communications with defendant's representatives. She filed an EEOC complaint. Therefore, it can be concluded that defendant is aware of plaintiff's participation in the protected activity.

**C. Defendant has subjected plaintiff to materially adverse employment actions.**

161. Plaintiff has sustained adverse employment actions as alleged in detail above.

162. Defendant's "Covid policy", as alleged herein and described in more detail in plaintiff's affidavit, describes materially adverse changes in the terms and conditions of employment, compared to the conditions of employment which existed prior to defendant's implementation of its "Covid policy".

163. These changes do not simply create an inconvenience for plaintiff, they substantially altered the manner in which she is able to do her job and interact with co-workers by substantially impairing her ability to perform her essential employment duties.

164. Each of the foregoing adverse employment actions resulted from every effort defendant undertook to coerce plaintiff into submitting to its "Covid policy" mitigation measures, and each adverse employment action described herein was causally related to plaintiff's good faith refusal of the mitigation measures.

165.  Each adverse employment action took place within moments of, or in direct response to, plaintiff claiming her rights, expressing violations of her rights and her good faith refusal to comply with defendant's policy.

166.  These facts demonstrate defendant's adverse employment actions derive from the "Covid policy" and defendant' failure to comply with the ADA.

**D. A causal connection exists between the adverse employment actions and the protected activity.**

167.  Upon giving defendant notice that she opposed non-job-related medical treatments, tests and inquiries, that were also disability-related inquiries, defendant began retaliating against plaintiff by imposing punitive measures and adverse employment actions upon her for her good faith refusal of mitigation measures and opposition to the policy. Ultimately, she was fired for being "untreated".

168.  Defendant's implementation of the "Covid policy" is a direct and proximate cause of defendant's decision to require new terms and conditions of employment that diminished plaintiff's job security and benefits of the job, interfered with plaintiff's rights, increased discipline, and terminated plaintiff's employment.

169.  Simply put: defendant implemented a policy which regards plaintiff as a direct threat and misclassifies plaintiff as impaired because she is "untreated", when the plaintiff refused non-job-related treatments, tests and inquiries that were also disability-related inquiries; defendant responded with adverse employment actions.

170.  Beginning from the moment she gave notice to defendant, plaintiff suffered adverse employment actions[15] and defendant continued attempting to impose its "Covid policy" upon plaintiff.

171.  Defendant ignored and denied her claim of disability, then it retaliated against her for refusing non-job-related mitigation measures as alleged in plaintiff's affidavit.

172.  Defendant's "Covid policy" itself creates the causal connection between the imposed measures and the consequences for refusing them, including termination.

173.  It is defendant's "Covid policy" itself which demonstrates that plaintiff is being perpetually classified as a "direct threat" because she remains "untreated" for a hypothetical disease.

---

15 Under the ADA, adverse employment actions include any actions taken which interfere the with plaintiff claiming their rights; which deter plaintiff from claiming their rights or which punish or retaliate against plaintiff for claiming their rights.

**174.** The policy itself issues deadlines and consequences which vividly demonstrate the causal connection between medical demands and adverse employment actions.

**175.** The moment plaintiff refused non-job-related medical treatments and inquiries she was subjected to the above-mentioned adverse employment actions, and was scheduled for termination.

**176.** Plaintiff's allegations satisfy the elements of retaliation by showing that she has engaged in protected activity, that defendant is aware of plaintiff's participation in said protected activity, that defendant has subjected plaintiff to adverse employment actions, and that there is a causal connection between the protected activity and defendant's retaliatory conduct.

**177.** The plaintiff demands a trial by jury.

**WHEREFORE** plaintiff demands injunctive relief, including but not limited to: (i) a judgment from this Court that defendant's actions were unlawful; (ii) back pay; (iii) compensatory damages in whatever amount the plaintiff is found to be entitled; (iv) reinstatement, or in the alternative front pay in the event reinstatement is not practical; (v) an equal amount as liquidated damages, other monetary damages; (vi) an award of costs and reasonable court fees; and (vii) punitive damages to the extent available; (viii) pre-judgment and post-judgment interest; and (ix) a jury trial on all issues so triable, and for other relief deemed appropriate by this court.

DATED this 27th day of April, 2023.

Alexis Brode
Plaintiff in *propria persona*

Alexis Brode, plaintiff in *propria persona*
229 Pleasant Street, Unit 2
Portsmouth, NH 03801
858-205-4203; akbrode@gmail.com

## UNITED STATES DISTRICT COURT
## NORTHER DISTRICT OF ILLINOIS
219 South Dearborn Street, Chicago, IL 60604

ALEXIS BRODE,
PLAINTIFF,

v.                                                  CASE NO.  1:22-CV-02903

XERIS PHARMACEUTICALS, INC.,
DEFENDANT.
_____/

### CERTIFICATE OF SERVICE

I, Alexis Brode, hereby certify that a true and correct copy of the foregoing Amended Complaint and Affidavit in support of the Amended Complaint and Exhibits was duly served upon the defendant's attorneys, Kimberly Anne Ross and Karl Edward Analo, at the address of Ford & Harrison LLP; 180 N Stetson Avenue; Suite 1660; Chicago, Illinois 60601, via first class mail on this 27th day of April, 2023.

By: *aB*